# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GEORGE P. MITCHELL,

      Plaintiff,

v.                                            CV 10-1206 WPL/GBW

ZIA PARK, LLC, d/b/a ZIA PARK & BLACK
GOLD CASINO, and PENN NATIONAL
GAMING, INC.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

George P. Mitchell brought this lawsuit against Zia Park, LLC ("Zia Park") and Penn National Gaming, Inc. ("PNGI") alleging that he was retaliated against and constructively discharged for statutorily protected conduct in violation of Title VII of the Civil Rights Act and the New Mexico Human Rights Act ("NMHRA"). (Doc. 1.) The parties consented pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b)(2), giving me authority to resolve case dispositive matters. Zia Park and PNGI have filed two dispositive motions, and I have carefully considered the pleadings, the record, and the relevant law.

PNGI filed a motion for summary judgment. (Doc. 49.) The motion asserts that PNGI is a separate entity from Zia Park and that it is not liable under a respondeat superior theory. (*Id.*) Mitchell does not contest PNGI's motion. (Doc. 54 at 20.) Thus, PNGI's motion shall be granted without further discussion and PNGI shall be dismissed as a Defendant in this action.

Zia Park also filed a motion for summary judgment, arguing that there is no genuine issue of material fact and that it is entitled to judgment in its favor as a matter of law. (Doc. 48.)

Considering the evidence in the light most favorable to Mitchell, *R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1142 (10th Cir. 2009) (quotation omitted), I conclude that Mitchell has failed to establish a *prima facie* case of retaliation in violation of Title VII and the NMHRA; therefore, Zia Park is entitled to judgment as a matter of law.

EVIDENTIARY ISSUES

Before discussing the factual background, which requires reference to the evidence supporting the material facts, I must address the numerous evidentiary issues presented by the briefing on Zia Park's motion for summary judgment. Mitchell argues that Zia Park's Exhibits N, O-T, V, X[1], AA, BB, DD-HH, and JJ-LL are not admissible because they are unauthenticated, contain unsworn statements that do not purport to be based on personal knowledge, and include hearsay without showing that they satisfy the business records exception. (*See* Doc. 54 at 10-13.) Zia Park, in turn, contends that Mitchell has relied on inadmissible hearsay and a sham affidavit that is directly contradicted by his sworn deposition testimony in his response to the motion for summary judgment. (Doc. 57 at 1-5.)

Tenth Circuit precedent establishes that courts may only consider uncontested facts and admissible material when ruling on a motion for summary judgment. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010) (citations omitted). While the form of the evidence produced need not be admissible at trial, "the content or substance of the evidence must be admissible." *Id.* (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)). To explain this requirement, the *Johnson* Court used the example of evidence presented in an affidavit. *Id.* In

---

[1] In his response, Mitchell states that he objects to Paragraph 21 of Zia Park's motion because he "objects to Defense Exhibit X." (Doc. 54 at 11.) However, Paragraph 21 cites to Defense Exhibit Y; Defense Exhibit X is mentioned in Paragraph 20. (Doc. 48 at 7.) Mitchell is bound by his own language, and I decline to construe Mitchell's objection to Exhibit X as an objection to Exhibit Y.

general, an affidavit is not a form of evidence that is admissible at trial; however, in ruling on a motion for summary judgment, a court can consider an affidavit so long as the content discussed in the affidavit would be admissible at trial. *Id.*

In 2010, the Federal Rule of Civil Procedure governing summary judgment, Rule 56, was overhauled, and a subdivision establishing procedures for supporting factual positions in summary judgment pleadings was added. FED. R. CIV. P. 56(c) advisory committee's note (2010 Amendments). Part of this new subdivision provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). The Advisory Committee notes further clarify that an objection to cited material functions just as an objection at trial, shifting the burden to the proponent "to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56(c)(2) advisory committee's note (2010 Amendments). This change and the others made to the Rule were designed to render the procedures for summary judgment "more consistent with those already used in many courts." FED. R. CIV. P. 56 advisory committee's note (2010 Amendments).

The Tenth Circuit has not yet had an opportunity to opine on whether the 2010 changes impact the standard for evaluating the admissibility of cited material at the summary judgment stage. A few district courts have discussed the evidentiary effect of the amendments. *See, e.g.*, *Gaub v. Prof'l Hosp. Supply, Inc.*, No. CIV. 1:10–313 WBS, 2012 WL 73302, at *5-6 (D. Idaho Jan. 10, 2012); *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *1-2 (W.D. Mich. Oct. 31, 2011); *Equal Emp't Opportunity Comm'n v. Mike Hooks, Inc.*, No. 2:09 CV477, 2011 WL 1807369, at *5-7 (W.D. La. May 11, 2011). In a particularly thorough discussion,

a court in the Western District of Michigan described the amendments as "a sea change in summary judgment procedure . . ." in at least some respects. *Foreword Magazine, Inc.*, 2011 WL 5169384 at *1. In that case, the court was faced with a motion for summary judgment supported by exhibits that had not been authenticated; after an objection, the moving party replied and attached affidavits attesting to the authenticity of the documents. *Id.* at *2. The court explained that Rule 56 previously required that all documents be authenticated, but the amendment deleted that requirement and replaced it with "a multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method . . . [for] doing so at trial." *Id.* The court overruled the objections at hand, concluding that the moving party used the process explained by the rule to authenticate the documents. *Id.* at *2-3. However, the court did not consider what would have been required had the party merely proposed a method to authenticate the documents at trial.

Given the dearth of precedent analyzing the post-2010 Rule 56 procedure, I will refer to the general policies underlying summary judgment. Principal purposes of summary judgment include streamlining litigation and saving needless time and expense by isolating and disposing of purely legal issues and factually unsupported claims and defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Farnell v. Albuquerque Publ'g Co.*, 589 F.2d 497, 502 (10th Cir. 1978) (citations omitted). The amendment to Rule 56 recognizes this cost- and time-saving purpose by expressly allowing the court to consider evidence in an inadmissible form so long as the proponent can explain how the evidence will be admissible when subjected to the rigors of trial. However, summary judgment affects important substantive rights of the litigants, and a court cannot glibly grant such a motion. *See Mach. Ctr., Inc. v. Anchor Nat'l Life Ins. Co.*, 434 F.2d 1, 6 (10th Cir.

4

1970). Thus, in response to an objection to summary judgment evidence, the proponent of the evidence cannot merely assert that they will be able to produce evidence in an admissible form; rather, they must thoroughly explain the admissible form that they will introduce at trial. Because of the significant impact of summary judgment, it is unfathomable that Rule 56 would allow a court to consider evidence that may not be admissible at trial.

I conclude that the 2010 amendments to Rule 56 effected no more than a minor change to this circuit's standard for considering evidence on summary judgment. As was true previously, courts can consider evidence that is currently in an inadmissible form. If an objection is made to an exhibit, the proponent of the exhibit has two options. One possibility is to correct the problem leading to the objection. For example, the proponent of a business record offered for the truth of the matter asserted could submit an affidavit from the records custodian that complies with Federal Rule of Evidence 803(6). In the alternative, the proponent can explain how the contents of the exhibit will be submitted at trial so that the information is admissible. Using the same example, the proponent of the business record could explain how each of Federal Rule of Evidence 803(6)'s requirements will be met. While it may seem picayune to require a party to fully explain admissibility, granting summary judgment on the basis of evidence that a party has not demonstrated will be admissible would do a grave injustice to the nonmoving party.

## I.    Mitchell's Objections

Mitchell objects to Zia Park's exhibits on grounds of hearsay, failure to authenticate, and lack of personal knowledge. Mitchell fails to offer the Court a careful analysis of his objections; instead, he repeats the same objections to several exhibits without differentiation. Zia Park similarly responds to the objections in broad strokes. With respect to the hearsay objections, Zia Park fails to

carefully explain the purposes for which each exhibit is offered and, if offered for the truth of the matter asserted, the intricacies of the applicable hearsay exception. Zia Park was in some cases more careful when responding to the authentication objection but often presented overarching responses lacking specific analysis. Rule 56(c)(2) and the explanatory notes clearly place the burden on the proponent of the evidence to explain its admissibility. I will keep this burden in mind as I proceed.

In responding to the objections, Zia Park chose to explain the anticipated admissible form of each exhibit.[2] It asserts that Exhibits N, O, Q, R, S, T, V, X, BB, DD, EE, FF and LL are admissible pursuant to the business records exception. (Doc. 57 at 5-7.) Zia Park states that each of these exhibits is a record regularly kept in the ordinary course of business and is therefore admissible under Federal Rule of Evidence 803(6). (*Id.*) Zia Park's mere assertion that the records are regularly kept in the ordinary course of business certainly would not suffice to render the documents admissible at trial. It also is insufficient to explain how the documents would be rendered admissible. Zia Park fails to assert that each of the conditions of Rule 803(6) is met and fails to state who would certify or testify to the conditions. *See* FED. R. EVID. 803(6) (2011 Amendments). Moreover, some of these documents contain hearsay within hearsay. *See* FED. R. EVID. 805. Specifically, Exhibits O, S, T, BB and DD, which Zia Park asserts are admissible as business records, are filled with second and third hand statements. Zia Park has failed to explain a basis for the admission of those second and third hand statements. For hearsay within hearsay to be admissible, "a hearsay exception must apply to each link of the chain." *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 650 (10th Cir. 2008) (citing FED. R. EVID. 805). For these reasons, I find

---

[2] Because the burden lies on the proponent of the evidence, I will rely solely on the objections that were made by Mitchell and the arguments for admissibility explained by Zia Park.

Mitchell's hearsay objections to Exhibits N, O, Q, R, S, T, V, X, BB, DD, EE, FF and LL meritorious.

Zia Park proffers an additional rationale for the admission of Exhibit V, which consists of an employee's statement: that the document is offered not for the truth of the matter asserted but to show the information known to and believed by Zia Park. (*See* Doc. 57 at 6.) Thus, it does not constitute hearsay. *See* FED. R. EVID. 801(c)(2). I overrule Mitchell's objection to the extent that Zia Park relies on this document for non-hearsay purposes.

Zia Park asserts that Exhibits JJ and KK are admissions by Mitchell and so do not constitute hearsay. (Doc. 57 at 9.) These exhibits do consist of statements that purport to be written by Mitchell. Exhibit JJ is Mitchell's letter of resignation, so it is entirely his statement. (Doc. 48 Ex. JJ.) Exhibit KK, on the other hand, appears to be a document prepared by Zia Park and signed by Mitchell, Olga Randolph, and Brent Willis. (Doc. 48 Ex. KK.) It is titled "Exit Interview Questions" and includes five questions with answers purportedly by Mitchell. Statements that constitute admissions by an opposing party are not hearsay. FED. R. EVID. 801(d)(2). While Exhibit JJ is not hearsay under this rule and Exhibit KK includes non-hearsay, Exhibit KK is not in a form that is currently admissible. Zia Park has not explained how the entire contents of this exhibit will be submitted in an admissible form. I overrule Mitchell's hearsay objection to Exhibit JJ and to his statements that are included in Exhibit KK.

Exhibit GG, a handwritten statement purportedly by Judy Hare alleging that Mitchell requested Zia Park's Internal Controls Manual, and HH, a document containing witness statements and surveillance documents, were allegedly offered to show the reasonableness of Zia Park's employment determination and not for the truth of the included statements. (Doc. 57 at 8.) A

statement is not hearsay if it is not offered for the truth of the matter asserted. FED. R. EVID. 801(c)(2). To the extent that these documents are offered to show the basis for Zia Park's belief, they are admissible under the hearsay rules.

Zia Park does not assert an exception to the rule against hearsay for Exhibits P or AA.[3] (Doc. 57 at 5, 7.) Upon reviewing these exhibits, it is clear that both contain statements offered for their truth. Exhibit P was purportedly prepared by Mitchell, but it is not signed and bears no indicia that it is, in fact, a statement by an opposing party. Furthermore, Zia Park failed to offer any rationale for the admission of this document. Accordingly, I conclude that Exhibits P and AA constitute inadmissible hearsay and cannot be considered.

I will not address Mitchell's authentication argument regarding the exhibits that I have already deemed inadmissible. Zia Park asserts that Exhibits JJ and KK have been and would be authenticated by Mitchell. (Doc. 57 at 5-9 (citing Doc. 57 Ex. OO at 183:7-19, 195:19-196:16).) Certainly, testimony by a witness with knowledge is an acceptable way to demonstrate that an item is what it claims to be. *See* FED. R. EVID. 901(b)(1). I have some reservations about Zia Park's method for asserting that testimony has and will authenticate these documents. Zia Park cited to the transcript of Mitchell's deposition, during which Zia Park presented documents that Mitchell identified. However, Zia Park did nothing to show that the documents presented at the deposition were the same as the documents cited in this motion. Despite my reservations, because the deposition testimony confirms the dates and signatures on Exhibits JJ and KK, I will overrule the objections and find that the documents could be authenticated at trial.

_____

[3] Zia Park included an additional copy of Exhibit AA as Exhibit I. Exhibit I was not referenced in the Motion for Summary Judgment. Therefore, I will not consider it. *See* FED. R. CIV. P. 56(c)(3).

Zia Park contends that Exhibit V is authenticated by sufficient indicia of reliability to satisfy Federal Rule of Evidence 901(a) and (b)(4). Though letterhead alone is insufficient to authenticate a document unless it was provided during discovery and is being presented by the opposing party, *see Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (citations omitted), this document bears additional indicia of reliability. It was prepared on Zia Park letterhead, is signed and dated, and has been stamped "CONFIDENTIAL." I find that the writing is sufficiently authenticated by its distinctive characteristics. *See* FED. R. EVID. 901(a) & (b)(4).

Finally, Zia Park offers no statement regarding the authentication of Exhibits GG and HH. (Doc. 57 at 8.) There is nothing to demonstrate that the writings are what they claim to be. *See* FED. R. EVID. 901. The documents are not self-authenticating. *See* FED. R. EVID. 902. Thus, I conclude that Zia Park has failed to meet its burden to rebut Mitchell's objection to Exhibits GG and HH, and I will not consider these exhibits.

In summary, I will not consider Zia Park's Exhibits N, O, P, Q, R, S, T, V, X, AA, BB, DD, EE, FF, GG, HH or LL. I also will not consider the contents of Zia Park's Exhibit KK other than Mitchell's statements. I will consider the remainder of the exhibits to Zia Park's motion for summary judgment and all of the exhibits to Zia Park's reply.

## II.    **Zia Park's Objections**

I must also address Zia Park's objections to some of the evidence set forth by Mitchell in his response. Zia Park takes issue with Mitchell's discussion of statements by Angela Craff and Omer Clarysse (Doc. 57 at 3-4 (citing Doc. 54 at 7-8).) Mitchell argues that the Craff statement constitutes an admission by the opposing party because Craff is a surveillance department employee of the casino. (Doc. 54 at 7.) He asserts no justification to support the admission of the Clarysse statement

aside from stating that Clarysse is a casino employee. (Doc. 54 at 8.) According to Zia Park, neither Craff nor Clarysse held a supervisory position or had authority to speak on behalf of Zia Park. (Doc. 57 at 3-4.)

In general, statements are not hearsay if they are made by the opposing party's agent or employee during the course of the relationship and on a matter within the scope of the relationship. FED. R. EVID. 801(d)(2)(D). Pursuant to Tenth Circuit precedent, when an employment dispute is at issue, "an employee's statements are not attributable to his employer as a party-opponent admission . . . unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue." *Johnson*, 594 F.3d at 1209 (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005)). Mitchell does not and could not contend that Craff or Clarysse were involved in the decisionmaking process related to the allegedly retaliatory actions. Even if that precedent did not apply, Mitchell has presented no evidence to support that these statements were made within the scope of Craff or Clarysse's employment. Thus, these statements are inadmissible hearsay, and I will not consider them in ruling on this motion.

Zia Park strenuously objects to paragraph three of Mitchell's Declaration (Doc. 54 Ex. E) and requests that this paragraph as well as paragraph twenty-six of Mitchell's asserted material facts (Doc. 54 at 7) be stricken. (Doc. 57 at 9-10.) According to Zia Park, Mitchell's statements in these paragraphs directly contradict his deposition testimony, and I should disregard them as an attempt to craft a sham issue of fact. (*Id.*) Mitchell did not respond to Zia Park's argument.

In his declaration, Mitchell asserts that the casino subjected him to increased surveillance one month after participating in a sexual harassment investigation, and that the surveillance caused him "enormous stress and embarrassment." (Doc. 54 Ex. E ¶ 3.) He further stated, " The thought

of being surveilled for purposes of harassment and to establish a track record for termination caused me anxiety, stress, and loss of sleep." (*Id.*) Previously, in his deposition, Mitchell testified about the effect of the perceived increased surveillance:

> Q. Assuming that you were being watched, which you believed, did that interfere with your work performance?
>
> A. It caused me stress.
>
> Q. Did it prevent you from doing your job?
>
> A. I'm professional, and I always do my job.
>
> Q. Do you feel like it changed your performance, that you didn't do your job as well?
>
> A. I probably wasn't as happy as I should have been on the floor, which in the entertainment industry is a big part.
>
>                                  * * *
>
> Q. All right. Other than not being as happy or cheerful when performing your duties, was there any other impact on your performance or your job that resulted from your belief that you were being watched?
>
> A. I don't believe so.

(Doc. 57 Ex. OO 131:18-132:14.)

When presented with a request to strike an affidavit in whole or in part, courts must first determine whether the affidavit does in fact conflict with the affiant's prior sworn statements. *Law Co., Inc.*, 577 F.3d at 1169; *see also Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (citations omitted). While a conflict alone is insufficient to strike the affidavit, it is a required prerequisite. *See Franks*, 796 F.3d at 1237. In this case, there is no conflict. Zia Park's questions during the deposition evidence its attempt to learn the impact of the surveillance on Mitchell's work performance. Mitchell testified to two potential effects that the surveillance had on his performance:

stress and reduced happiness. Unlike his deposition testimony, Mitchell's affidavit describes his emotional state as a result of the alleged increased surveillance. I conclude that Mitchell's testimony at his deposition is not directly contradicted by the affidavit, and, because Zia Park's questioning was not designed to learn all impacts of the surveillance, Mitchell did not omit the allegations regarding his mental state. Accordingly, I deny Zia Park's request to strike paragraph three of Mitchell's declaration.

FACTUAL AND PROCEDURAL BACKGROUND

The following statement of the facts is based on the undisputed facts and the exhibits that have not been excluded from consideration. Where facts are disputed, they are resolved in favor of Mitchell as the non-moving party.

Zia Park operates a casino and racetrack facility in Hobbs, New Mexico. (Doc. 48 at 2; Doc. 54 at 1.) Mitchell was employed by Zia Park as a slot machine attendant for nearly six years, from September 26, 2004 through April 9, 2010. (Doc. 48 at 2; Doc 54 at 1.) For the majority of those years, until June 2008, Mitchell was a part time employee. (Doc. 48 at 2; Doc. 48 Ex. B.) Throughout his employment, Mitchell received positive evaluations and recognition for doing his job well. (Doc. 48 Ex. M.) However, Mitchell's record as an employee was not entirely unblemished: on two occasions, female co-workers complained to their supervisors about unwelcome conduct by Mitchell. (Doc. 48 Ex. G.)

Mitchell claims that his problems at work began after he participated in a sexual harassment investigation against his immediate supervisor,[4] Christina ("Tina") Taylor, in August of 2009.

---

[4] Mitchell had several supervisors, including Ahmad Mughni, slot director, Christina Taylor, slot shift supervisor (later promoted to slot shift manager), Pam Reiathbaum Teer, slot shift manager, and Senaida Regalado, slot shift supervisor. (Doc. 48 at 3; Doc. 48 Ex. C at 24:5-25:2.)

Mitchell's friend and co-worker, Shelly Chesser, reported that she had been repeatedly sexually harassed by Taylor both at and outside of work.[5] (Doc. 54 at 4-6.) Mitchell was interviewed, along with at least one other person (*see* Doc. 48 Ex. V), and corroborated Chesser's reports by providing an eyewitness account of two incidents of alleged harassment and by confirming that Chesser had told him of other incidents. (Doc. 48 at 5; Doc. 48 Ex. U; Doc. 54 at 6-7.) Taylor received a final written warning and counseling as a result of the investigation. (Doc. 48 at 5.) Mitchell claims that after this investigation, he was subjected to retaliation and a hostile work environment that culminated in his constructive discharge.

Beginning in September of 2009, Mitchell believed that he was subjected to increased surveillance by Zia Park. (Doc. 54 at 7; Doc. 54 Ex. E at ¶ 2.) All Zia Park employees are subject to surveillance while at work because the surveillance and security employees of the casino monitor the activities taking place in the casino. (Doc. 48 at 6; Doc. 48 Ex. W at 1.) While Mitchell claims that the surveillance of him increased, he identifies no specific instances of heightened surveillance. (Doc. 54 at 7.) Mitchell asserts that, as a result of the surveillance, he experienced stress, embarrassment, anxiety, and loss of sleep. (*Id.*; Doc. 54 Ex. E at ¶ 3.) However, he does not contend that his work performance was impacted. (Doc. 48 at 6; Doc. 48 Ex. C at 131:18-132:14.)

On October 18, 2009, Mitchell was written up by Senaida Regalado (Doc. 48 at 7; Doc. 54 at 7.) According to Mitchell, Regalado reported that she heard him "tell a casino trainee not to provide certain tax information to a guest regarding a jackpot payout because it was too much paperwork." (Doc. 54 Ex. E at ¶ 4; *see also* Doc. 48 at 7; Doc. 48 Ex. Y.) She issued a verbal and

---

[5] Mitchell's statement of material facts in his response begins with pages describing the sexual harassment of Chesser and Chesser's employment history with Zia Park. These facts are irrelevant to this case, which deals with the alleged retaliation against Mitchell because of his participation in the sexual harassment investigation. *See* FED. R. EVID. 402.

written notice, but no further action was taken. Mitchell contends that the write-up was "bogus and false" because his statement was consistent with Zia Park's procedure. (Doc. 54 Ex. E at ¶ 4.)

Mitchell received another written warning on January 11, 2010, this time from Taylor. (Doc. 54 Ex. E at ¶ 6.) Taylor's purported reason for the warning was insubordination. (*Id.*) Mitchell described the incident as following a conversation that he had with a customer in which the customer reported mistakenly playing a twenty-five dollar slot machine instead of a twenty-five cent slot machine. (Doc. 48 Ex. CC.) Based on the conversation, Mitchell asked Taylor to meet with the customer. (*Id.*) He later asked Taylor about the outcome of the meeting and, when he learned that Taylor had not offered to reimburse the customer, he expressed his hope that the casino could give the customer fifty dollars. (*Id.*; Doc. 54 at 8; Doc. 54 Ex. Doc. 57 at 11.) Taylor deemed Mitchell's inquiry insubordination. (Doc. 54 at 8.) Immediately following the write-up, Mitchell indicated that he felt he was being singled out and that his supervisors were attempting to create an intolerable work environment. (Doc. 48 Ex. CC.)

On January 15, 2010, Mitchell attended a luncheon for employees held by Zia Park. (Doc. 57 Ex. OO at 206:22-207:7.) At the luncheon, Mitchell received an employee award. (*Id.* at 207:5-9.)

Mitchell's problems at work came to a head in April of 2010. On April 1, 2010, Mitchell requested a copy of a Zia Park manual. (Doc. 48 at 9; Doc. 54 at 8-9.) The parties dispute what manual was requested. Mitchell contends that, in March of 2010, he and other slot attendants met with General Manager Brent Willits due to confusion about their job responsibilities. (Doc. 54 at 8-9.) At the meeting, Mr. Willits agreed to place the slot attendants' Standard Operation Procedures ("SOP") manual in the jackpot station. (*Id.*) Mitchell agrees that he requested a manual on April 1,

but he asserts that he requested the SOP manual. (*Id.* at 9; Doc. 48 Ex. C at 175:8-20.) Zia Park

contends that it had reason to believe that Mitchell instead requested Zia Park's "black book" – an

internal controls manual containing information that could be used to steal from the casino. (Doc.

48 at 9-10; Doc. 48 Ex. W at 1-2.) By April 5, Mughni and the director of human resources had

determined that Mitchell had requested the black book without any job-related, legitimate purpose

and had decided to terminate his employment. (Doc. 48 at 10; Doc. 48 Ex. A at 5; Doc. 48 Ex. W

at 2.) On that same day, Mitchell learned of the decision to fire him; he called in to work on April

6 and submitted his resignation on April 7. (Doc. 48 at 10; Doc. 48 Ex. C at 200:17-201:10.)

Mitchell filed a formal Charge of Discrimination with the New Mexico Human Rights

Bureau on June 10, 2010, and he was given notice of his right to sue on his retaliation claim by the

Equal Employment Opportunity Commission on September 17, 2010. (Doc. 1 Exs. A & B.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits,

if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex*, 477 U.S. at 322-24. A fact is

"material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the

dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence

presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). The court

must view all "evidence and draw all reasonable inferences therefrom in the light most favorable to

the party opposing summary judgment." *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d

1199, 1204 (10th Cir. 2011) (quoting *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1146 (10th

Cir. 2007)). In ruling on a summary judgment motion, the court may neither make credibility

determinations nor weigh the evidence. *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quotation omitted).

RETALIATION CLAIM

To pursue a claim for relief under Title VII and the NMHRA, the plaintiff must first make out a *prima facie* case of unlawful retaliation. To establish a *prima facie* case, the plaintiff "must show that: (1) [he] engaged in protected activity; (2) the [defendant] took an adverse employment action against [him]; and (3) there exists a causal connection between the protected activity and the adverse action." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (citations omitted). Where there is no direct evidence of retaliation, a retaliation claim is analyzed under a burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Annett*, 371 F.3d at 1237. Once the plaintiff establishes a *prima facie* case, there is a presumption of retaliation and the burden shifts to the defendant to state a legitimate justification for the employment action. *Annett*, 371 F.3d at 1237. If the defendant offers such a reason for the action, the presumption is discarded and burden returns to the plaintiff to show with sufficient evidence that the justification is pretextual. *Id.*

Mitchell's only claim of protected activity is his participation in the investigation into Chesser's allegations of sexual harassment. Zia Park does not, for purposes of its motion, dispute that Mitchell engaged in protected activity when he participated in this investigation. (Doc. 48 at 12.) Accordingly, to satisfy the *prima facie* case, Mitchell must show that Zia Park took at least one adverse employment action against him after the investigation that was causally connected to his participation. Mitchell alleges four actions, including increased surveillance, two write-ups, and a false allegation regarding his request for a manual, that, according to him, culminated in Zia Park's

16

decision to terminate him and his preemptive resignation. In terms of the causal connection between the protected activity and the actions, Mitchell alleges that each measure "occurred after and in close proximity to the protected activity." (Doc. 54 at 17 (emphasis omitted).)

## I.   Adverse Action

Because Zia Park concedes that Mitchell engaged in protected activity for purposes of this motion, the first issue of the *prima facie* case that I must address is whether the Zia Park's actions were adverse. What is an adverse action? Because Title VII and state human rights acts were designed to encourage employees to report when they or others are being subjected to illegal workplace discrimination, an adverse action has been defined as one that would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 67-69 (2006) (quotation omitted); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (quotation omitted). While the inquiry is inherently fluid and driven by the particular facts presented in a case, it is also objective and does not turn on the plaintiff's personal feelings about the facts. *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (citations omitted). In the Tenth Circuit, "adverse employment action" is liberally defined; it is not limited to monetary losses and can include acts that pose "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Reinhardt*, 595 F.3d at 1133 (quoting *Annett*, 371 F.3d at 1239)).

### A.   Increased Surveillance

Mitchell alleges that he was subjected to increased monitoring by the surveillance department at the casino, but he offers no specific facts supporting his allegations of additional monitoring aside from hearsay statements from co-workers. (Doc. 1 at 4; Doc. 54 at 7, 14.)

17

Assuming that surveillance of Mitchell did increase, the alleged impact of the surveillance was enormous stress, embarrassment, anxiety and loss of sleep. (Doc. 54 at 7; Doc. 54 Ex. E at 1.)

The Tenth Circuit has recognized that sufficiently severe surveillance of an employee could constitute an adverse employment action. *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (unpublished); *see also Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998) (recognizing that sufficiently severe harassment by co-workers may be an adverse employment action). Zia Park relies on the Tenth Circuit's decision in *Tapia*, 170 F. App'x 529, to argue that increased monitoring without a consequent change in benefits or status is insufficient to constitute an adverse action as a matter of law. (Doc. 48 at 16, 22.) The *Tapia* Court did include language to that effect in the opinion. 170 F. App'x at 534. However, that language appears to be based largely on the factual circumstances, including the employer's denial of the allegation that the plaintiff was followed. *Id.* at 533-34. Here, Zia Park does not clearly deny Mitchell's allegation. Furthermore, unpublished opinions like *Tapia* may be cited as persuasive authority, but they lack precedential value. 10th Cir. R. 32.1. Because the opinion was not published, the *Tapia* Court could not have intended to outline a new rule that heightened surveillance without a resulting change in benefits or status is not an adverse action as a matter of law.

However, based on the facts viewed in the light most favorable to Mitchell, I find that the increased monitoring was not sufficiently severe to generate a material issue of fact as to whether it constituted an adverse action. In making this determination, it is important to consider the totality of the circumstances. Mitchell was employed as a slot attendant working on the floor of a casino. Zia Park monitors all activities on the casino floor including the activities of the employees. (Doc. 48 Ex. W at 1.) It is only reasonable to assume that, as an employee for several years, Mitchell was

18

accustomed to being under surveillance during his daily work activities. As a result, the impact of increased surveillance is lessened. Furthermore, the impact that Mitchell alleges is an entirely personal feeling and not an objective effect. The surveillance did not damage his reputation or affect his future employability. It also did not result in any significant change in his employment status. There is no issue of material fact, and the increase in surveillance as alleged was not an adverse employment action.

> B.     *October and January Write-Ups*

Mitchell also alleges that he was written up based on false allegations in October of 2009 and January of 2010. Mitchell contends that these write-ups constitute an adverse actions because they were placed in his personnel file. (Doc. 54 at 15.) Merely placing a written, false allegation in a personnel file does not rise to the level of an adverse employment action. To be an adverse action, the write-up must cause some change in employment status or concretely harm the plaintiff's prospects for future employment. *See Annett*, 371 F.3d at 1239 (citations omitted). The write-ups, standing alone, do not constitute adverse employment actions.

> C.     *April Allegation*

In April, Mitchell requested a Zia Park manual, and this request led to an investigation against him and the decision to terminate his employment. After learning of the decision to terminate his employment, Mitchell decided to resign. As a result, the impact of the accusation regarding the manual is intimately tied to Mitchell's claim of constructive discharge. This issue will be addressed below.

> D.     *Constructive Discharge*

When an employee resigns his position, he may argue that he was constructively discharged to support the second prong of a *prima facie* case of retaliation. The constructive discharge theory

is available if the working conditions were so objectively intolerable due to the employer's retaliatory acts that a reasonable person in the employee's position would have no other choice but to resign. *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 565 (10th Cir. 2010) (citations omitted); *Fischer v. Forestwood Co., Inc.* 525 F.3d 972, 980 (10th Cir. 2008) (citation omitted). Alternatively, constructive discharge may be asserted when the employer's discriminatory actions forced the employee to choose between resignation or termination. *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 860 (10th Cir. 2007) (citations omitted). Mitchell has asserted both theories. (Doc. 54 at 17-18.)

Under the first theory, Mitchell claims that Zia Park's actions, in aggregate, formed a pattern of retaliatory conduct that rendered his working conditions so difficult that a reasonable person would feel compelled to resign. (Doc. 54 at 17-18.) The alleged actions, in total, consist of heightened surveillance from September of 2009 through April of 2010, a write-up in October of 2009 that had no adverse consequences on job responsibilities or pay, a write-up in January of 2010 that had no adverse consequences, and an allegation in April of 2010 that was the basis for the decision to terminate him. Mitchell offers no case law to support his argument that the aggregate effect of these actions forced him to resign or to rebut Zia Park's argument that the acts did not rise to the level of intolerability. (*See* Doc. 48 at 18-20; Doc. 54 at 18.)

The test to determine whether the working conditions were intolerable is an objective one, under which neither Mitchell nor Zia Park's subjective views and intent are relevant. *Narotzky*, 610 F.3d at 565 (10th Cir. 2010) (quoting *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). Mitchell's burden to satisfy the test is a substantial one. *Id.* (citing *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009)). However, the existence of constructive discharge is an issue of fact for the jury, and judgment as a matter of law is only appropriate if the

evidence is susceptible to just one interpretation. *Strickland*, 555 F.3d at 1229 (citation omitted).

Several cases have discussed the type of evidence sufficient for plaintiffs to overcome the high bar for constructive discharge. For example, one plaintiff met the burden by presenting evidence that her supervisor asked her to quit multiple times because of her age and appearance, repeatedly confronted her with performance shortcomings, took away longstanding job responsibilities, and did not provide sufficient information or training to enable her to perform her new duties. *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1574-75 (10th Cir. 1992). In another case, a plaintiff stated a claim for constructive discharge when she presented evidence that she believed her job was in jeopardy, she was repeatedly told that her performance was unacceptable, she was set up to fail on multiple occasions because she was forced to make written commitments to win certain contracts, and she was not provided with job support when she requested it. *Strickland*, 555 F.3d at 1229.

But presenting evidence that working conditions were difficult or unpleasant is not enough. *Fischer*, 525 F.3d at 981. For example, even where a plaintiff produced evidence that his employer made derogatory remarks about his national origin, ordered him to submit to a polygraph examination due to his national origin, belittled and mistreated him at company seminars, and ordered him to fire other members of his national origin employed by the company, the Tenth Circuit concluded that the plaintiff failed to allege conditions rendering the workplace sufficiently intolerable for a viable claim of constructive discharge. *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1384, 1386 (10th Cir. 1991).

Mitchell's working conditions at Zia Park did not come close to approximating the working conditions under which plaintiffs suffered even where they failed to establish constructive discharge, *see Daemi*, 931 F.2d at 1386, let alone where they did establish an issue of fact regarding

constructive discharge. *See Strickland*, 555 F.3d at 1229; *Acrey*, 981 F.2d at 1574-75. First, and most importantly, none of Mitchell's job responsibilities were altered as a result of the alleged actions, and he was never threatened with the loss of his job. Second, the acts he alleges took place over the course of over seven months; with the exception of the surveillance, several months with no retaliation passed between each alleged act. This is, quite simply, not the sort of constant or repetitive action that is contemplated when courts find intolerable working conditions. With regard to the surveillance, based on the level of security involved in casino operations, an increase in surveillance could not suddenly make Mitchell's working conditions intolerable. Mitchell's allegations fall far short of establishing that a genuine issue of material fact exists as to whether his workplace was objectively intolerable.

Mitchell's alternative theory of constructive discharge, that he was forced by Zia Park's retaliatory action to choose between resignation and termination, relies on the April 2010 allegation regarding the Zia Park manual and Zia Park's decision, based on that allegation, to terminate his employment. (Doc. 54 at 17-18.) It is undisputed that Zia Park would have terminated Mitchell had he not preemptively resigned, and Mitchell resigned only after he was informed by a co-worker that Zia Park planned to terminate his employment. Accordingly, Mitchell has established an adverse action under his alternative theory of constructive discharge.

## II.    Causal Connection

To establish the third element of his *prima facie* case, Mitchell must show that Zia Park's adverse action was causally related to his participation in the sexual harassment investigation. The critical question at this stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Garrett v.*

*Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)). Such an inference may be drawn based on timing alone when the adverse action closely follows the protected activity. *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citations omitted). If the length of time between the protected conduct and the adverse action is more substantial, additional evidence is required. *Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007).

The meaning of "closely follows" is not immediately evident, but it is generally accepted that a forty-five day period between the protected conduct and the adverse action meets the definition while a three-month period does not. *O'Neal*, 237 F.3d at 1253 (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999)); *see also Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008) (collecting cases). However, when there is a pattern of retaliatory conduct that eventually culminates in the termination of employment, the phrase "closely follows" should not be read too restrictively. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (citing *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996)).

Mitchell asserts that the causal connection can be inferred between his participation in the sexual harassment investigation and Zia Park's actions based on temporal proximity. (*See* Doc. 54 at 17.) Because I found that none of the actions alleged by Mitchell, aside from the events that occurred in April of 2010, could constitute adverse actions as a matter of law, I need not address whether they were causally connected to Mitchell's protected conduct. Over seven months elapsed between the August 2009 investigation and the events in April of 2010. This is a time span too extended to infer causation in satisfaction of the third prong of the *prima facie* case unless a relaxed definition of "closely follows" applies. The issue presented, then, is whether the surveillance and two write-ups, which were not adverse actions, constitute a pattern of retaliatory conduct culminating in the events that occurred in April of 2010.

The so-called "pattern of retaliatory conduct" consists of continuous surveillance and three distinct events that occurred over the course of seven months. Each event was separated by two to three months with no alleged retaliatory action. Neither the surveillance nor the two events closest in time to the protected conduct constitute adverse employment action. None of the events in the "pattern" contributed to Zia Park's decision to terminate his employment, as it is undisputed that the decision was premised on the events that transpired in April. Finally, Mitchell testified that he received an award from Zia Park on January 15, 2010, just after the January write-up and prior to the events in April. This does not constitute "a particularly impressive 'pattern of retaliatory conduct.'" *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231-32 (10th Cir. 2004) (considering two instances over four month period, one of which was not an adverse action).

I have found one case in which the Tenth Circuit found a pattern of retaliatory conduct justifying an inference of retaliatory intent[6] when seven months transpired between the protected conduct and the ultimate termination of employment. *Marx*, 76 F.3d at 329. In that case, immediately after the plaintiff engaged in protected conduct, his employer began citing him for deficiencies in job performance. *Id.* at 326. Those citations were numerous and continued for two months. *Id.* In the third month after plaintiff's protected conduct, his employer demoted and transferred him. *Id.* Finally, seven months after the protected conduct, the plaintiff was fired. *Id.* at 327. This pattern of conduct is vastly distinct from the "pattern" alleged by Mitchell.

Viewed in the light most favorable to Mitchell, I find that the "pattern of retaliatory conduct" alleged is insufficient to support the inference that his protected conduct was casually related to the events that transpired seven months later and resulted in his resignation.

---

[6] In this case, the plaintiff's *prima facie* case was not at issue.

CONCLUSION

Mitchell has failed to state a *prima facie* case of retaliation in violation of Title VII or the

NMHRA. For the foregoing reasons, I order that PNGI's Motion for Summary Judgement (Doc. 49)

is granted, Zia Park's Motion for Summary Judgment (Doc. 48) is granted, and that Mitchell's

Complaint (Doc. 1) is dismissed with prejudice.

IT IS SO ORDERED.


William P. Lynch
United States Magistrate Judge


A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.          25